Filed 3/18/16

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JEFFREY SCHERMER et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> THOMAS T. TATUM et al., <br><br> Defendants and Respondents. | D067807 <br><br><br> (Super. Ct. No. 37-2014-00083369-CU-MC-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Joel M. Pressman, Judge. Affirmed.

Robbins Arroyo, Brian J. Robbins, George C. Aguilar, Michael J. Nicoud, Leonid Kandinov; Allen, Semelsberger & Kaelin, George H. Kaelin III, James C. Allen, David Semelsberger, Jessica S. Taylor; Law Offices of George W. Cochran and George W. Cochran for Plaintiffs and Appellants.

Cooksey, Toolen, Gage, Duffy & Woog, Phil Woog and Matthew R. Pahl for Defendants and Respondents.

Plaintiffs and proposed class representatives Jeffrey Schermer, David Moravee, Tom Fisher, Janice Wenhold, Karen Vielma, Gloria Carruthers and George Rivera (collectively plaintiffs) appeal from an order sustaining a demurrer without leave to amend to the class allegations in four of their causes of action in their second amended complaint (SAC or operative complaint). Plaintiffs' SAC involves 18 mobilehome parks allegedly owned and/or operated by defendants Thomas T. Tatum (Tatum) and Jeffrey A. Kaplan (Kaplan), which plaintiffs allege were managed through defendant Mobile Community Management Company (MCM). Also named as defendants are 18 "single-purpose" business entities that plaintiffs allege each owned one mobilehome park in California (Tatum, Kaplan, MCM and the 18 entities are sometimes collectively referred to as defendants).

Plaintiffs brought a class action on behalf of residents who live in the 18 mobilehome parks. Plaintiffs alleged they were subjected to uniform unconscionable lease agreements and leasing practices by defendants. Plaintiffs' 48-page operative complaint (excluding voluminous exhibits) alleged among others causes of action (1) unfair business practices; (2) breach of the covenant of quiet enjoyment; (3) breach of duty of good faith and fair dealing; and (4) fraud and deceit.

On appeal, plaintiffs contend that the trial court prematurely dismissed their class allegations because their operative complaint adequately pleaded "a community of interest with typical class representatives and predominately common questions of law and fact" with respect to their four causes of action; and that in so doing, the court improperly assessed its action "on the merits and failed to properly credit [p]laintiffs'

2

unambiguous allegations, which were supported by the actual form lease agreements attached to the [SAC]."

As we explain, we independently conclude the court properly sustained without leave to amend the demurrer to the class allegations in each of the four causes of action at issue, when it found there was no reasonable possibility plaintiffs could satisfy the community of interest requirement for class certification. Affirmed.

OVERVIEW

Plaintiffs filed their original class action complaint in January 2014. That complaint alleged a putative class consisting of every person "who had an ownership interest in a mobilehome in one of the Mobile Home Parks at any time since January 14, 2010 (the 'Class')," which included a " 'Senior Citizen Sub-Class' " in which all class members were over 65 years old and a " 'Non-English Speaking Sub-Class' " in which all class members primarily communicated in Spanish, Chinese, Tagalog, Vietnamese, or Korean. In response to the demurrer of defendants, plaintiffs filed their first amended complaint (FAC) in April 2014.

In the FAC, plaintiffs again alleged defendants Tatum and Kaplan, through MCM, engaged in unlawful conduct at each of the 18 mobilehome parks. Specifically, they alleged defendants "charg[ed] excessive rent, pursu[ed] arbitrary evictions, and implement[ed] unreasonable polices." Plaintiffs further alleged in their FAC that defendants Tatum and Kaplan took "advantage of vulnerable prospective and current residents" including "non-[E]nglish speaking and elderly residents" who, plaintiffs claimed, were "especially susceptible" to defendants' unlawful business practices. Plaintiffs alleged defendants "most egregious practice" was the use of a "one-sided,

3

standardized lease" agreement. Plaintiffs provided 32 examples of lease clauses that allegedly violated California's Mobilehome Residency Law (Civ. Code, § 798 et seq.; MRL).

Plaintiffs' FAC also set forth about 11 "factors" that plaintiffs alleged showed procedural unconscionability between plaintiffs and the putative class, on the one hand, and defendants, on the other. Such factors included among others "residents' poor socio-economic background" and defendants' "knowledge of residents' vulnerability to oppression." Plaintiffs also listed about 17 examples of substantive unconscionability in their FAC in connection with defendants' use of the standardized lease agreement in the 18 mobilehome parks. As before, plaintiffs' class action allegations included any person who had an ownership interest in a mobilehome in any of the 18 parks, and a senior citizen and non-English-speaking subclass.

Defendants demurred to plaintiffs' FAC. At the demurrer hearing, plaintiffs' counsel agreed with the court that plaintiffs' FAC was "a mess" and counsel admitted they "did a horrible job in succinctly and systematically putting forth facts that show what the [FAC] -- what the case is about and how it shows a pattern of conduct that is deserving of being treated in a class action." The record shows the court next offered plaintiffs a "couple observations" regarding the FAC, including that the case was "complex" because plaintiffs "have many mobile home parks"; that plaintiffs "only have a couple class representatives," "[n]one of whom are in any of the other parks"; that the case involved "individual contracts" between the parties; and that plaintiffs were "going to have a real difficult time . . . naming and identifying a class" because plaintiffs needed separate representatives for each of the separate mobilehome parks.

4

In its subsequent order sustaining with leave to amend defendants' demurrer to the class allegations in the FAC, the court ruled in part as follows:

"Plaintiffs allege multiple causes of action, all of which related in some way to the Lease Agreements utilized at the Defendants['] parks. Based upon the allegations in the [FAC], it appears that some of the claims involved the alleged unconscionability of the contracts themselves, while others involve each Defendant's alleged actions in executing or enforcing the individual contracts as to individual Plaintiffs. [¶] The Court finds that multiple factual allegations predominate. Plaintiffs['] measure of damages will be unique to each park. The proposed class does not all reside at the same location or under the same circumstances. Each putative class member is/was a resident at one of the eighteen separate mobilehome parks located throughout the State of California, giving rise to individualized factual questions related to causation, liability, and damages.

"Example of the individualized issues include the remedy (determining excess rents paid at each space requires a factual showing of fair market values for rents in a particular area [at] a particular time and park-by[-]park appraisal). Further, there appear to be multiple lease agreements. Although Plaintiffs allege Defendants used a 'standardized' Lease Agreement, they attach at least five different variations of the Lease Agreement and/or Amendments to the Lease Agreement. (See Exhibits 'A,' 'B,' 'C,' 'D,' and 'E,' attached to the [FAC].)

"Further, the allegations involve more than unconscionability of common provisions in the agreements, but include individual actions in execution and enforcement of the lease. Plaintiffs allege that Defendants: (1) Did not allow tenants to see copies of their leases until they committed to purchasing their homes; (2) misrepresented the terms

5

of their leases to prospective tenants; (3) threatened actual and/or constructive eviction to pressure them into signing long-term leases; (4) engaged in a 'homechurning' scheme with regard to certain Plaintiffs; and (5) unfairly competed with home sales by charging discriminatory 'transfer fees.' (See FAC paragraphs 76-79.) These claims will each turn on the personal interactions between each park operator and the individual plaintiffs.

"Many of the Plaintiffs would not have claims at all, particularly if they did not sell or attempt to sell their homes. Specifically, with respect to the second, third, and fourth causes of action, plaintiffs alleged that defendants took certain actions when particular Plaintiffs attempted to sell their mobilehomes. [¶] . . . [¶]

"Finally, there are separate ownership issues with the various defendants. Pursuant to Judicially Noticeable Secretary of State business filings, the ownership entity for each Park is a separately-owned, single-purpose limited partnership (or in one instance, a limited liability company). (Exhibit '2,' Business Filings, attached to Req. for Jud. Notice[.]) The various ownership interests create issues of whether the claims of the representative party (whether the currently named representative or another party) would be typical of the class."

Plaintiffs in September 2014 filed their SAC, which is the subject of this appeal. The class action allegations in the SAC provided the class consisted of "persons who: (1) acquired an ownership interest in a mobilehome in one of the Mobilehome Parks at any time since January 9, 2010, (2) were not previously residents at any Mobilehome Park prior to acquiring such ownership interest, and (3) are subject to a lease agreement containing the unconscionable provisions as set forth herein (the 'Class')." The SAC also set forth *21 subclasses*, including 18 subclasses for each of the 18 mobilehome parks at

issue in the SAC; a subclass for "Transfer-Charge," in which the putative class members during the class period (i.e., from January 9, 2010 to the present) transferred their ownership interest in a mobilehome or assigned their space and thus incurred a transfer fee charge; a subclass for "Notice of New Rental Rate," in which the putative class members since the filing of the original complaint entered into an "Amendment to Lease/Rental Agreement With Rent Adjustment" that barred such members from "any participation or recovery in this lawsuit" in exchange for a rent reduction; and a subclass referred to as "Prior Owner," in which all putative class members obtained an ownership interest in a mobilehome in any of the 18 parks *before* the class period, but which members also executed "any addendum or amendment to their original lease" during the class period (the latter three subclasses are sometimes collectively referred to as the lease subclasses).

The SAC named seven class representatives from five of the 18 named mobilehome parks. The seven class representatives were identified as representatives of both the class and of five distinct park subclasses where they reside or resided. The SAC did not identify representatives for either the remaining 13 mobilehome park subclasses or the lease subclasses.

Plaintiffs in their SAC alleged that Tatum and Kaplan were general partners; that as partners, Tatum and Kaplan owned "directly or indirectly" each of the 18 mobilehome parks at issue; that each park was managed by the same management company, MCM; and that MCM used "standardized lease forms at each of the parks -- changing only the name of the park on the form -- meaning the lease provisions across the parks are highly uniform." Plaintiffs further alleged the preprinted form lease agreements used by MCM

7

contained verbatim or virtually verbatim "material provisions that escalate[d] rent to unconscionable levels far above fair market rent"; violated the MRL; and "fraudulently misrepresent[ed] the nature and terms of the lease."

Plaintiffs also alleged in the SAC that Tatum and Kaplan, through MCM, implemented a "uniform, procedurally unconscionable procedure to dupe" plaintiffs and the class members into signing the alleged unconscionable lease agreements; and that in "each and every lease transaction with [p]laintiffs and [c]lass members, [d]efendants implement[ed] the following policy and procedure" to "trap" plaintiffs and the putative class members:

"(a) No disclosure of standard form lease agreements to [p]laintiffs and [c]lass members until after they financially commit to purchasing a mobilehome;

"(b) Presenting standard form lease agreements to [p]laintiffs and [c]lass members on a 'take it or leave it' basis with no opportunity to negotiate lease terms;

"(c) Prohibiting [p]laintiffs and [c]lass members from taking a copy of the lease agreement home to review prior to signing;

"(d) Requiring execution of a standard lease agreement by [p]laintiffs and [c]lass members at the time of presentment without the benefit of prior review of its terms;

"(e) No offer of lease options to [p]laintiffs and [c]lass members as purported in the standard form lease agreements [citation]. Any lease provision indicating that such options were offered by [d]efendants and rejected by [p]laintiffs and [c]lass members prior to execution of the lease agreements are false and illusory;

"(f) Hiding material terms in a lengthy, protracted standard form lease agreement, including, but not limited to, substantial rent escalation provisions and language

8

permitting unlawful charges and pass-through of costs and expenses on a line-item basis, regardless of the decrease in overall aggregate maintenance costs;

"(g) Failing to provide all documents related to the lease until after expiration of the statutory review period; and

"(h) Obtaining [p]laintiffs and [c]lass members' signatures on Right of First Refusal Addenda, Arbitration of Disputes Amendments, and Amendments to Lease/Rental Agreements with Rent Adjustment under the threat of a substantial rent increase, which results in execution of the same by [p]laintiffs and [c]lass members under duress."[1]

Plaintiffs further alleged in their SAC that because MCM allegedly used preprinted, standardized forms, the "lease agreements treat all residents alike regardless of which park they reside in;" that the rental increase provisions in the standardized lease resulted in unconscionable yearly rent increases; and that such provisions contained "blatant statutory violations" and failed to include statutorily-required information.

Defendants demurred to the class action allegations in the SAC on the grounds that such allegations did not include properly alleged facts showing a community of interest in the elements of the class claims and a typicality of the alleged claims by the putative class representatives against all of the multiple defendants. Specifically, defendants contended that even *if* they had standardized procedures and/or lease agreements, the claims of the putative class necessarily resolved around the individual application or use of such procedures and/or agreements, noting: "not only are there

---

[1] For ease of reference, we sometimes will collectively refer to the practices in (a) through (h) as defendants' alleged "unconscionable policies and/or procedures."

eighteen different properties, Lease Agreements, and (likely) damages calculations at issue, but the causes of action relate largely to how each individual Class member interacted with Defendants. Each Lease, even if identical, was individually negotiated and executed. The manner of the negotiation, the documents provided, the verbal representations made, the language used in the negotiation . . . these are all unique interactions. The only common thread in the SAC is that the Lease Agreements themselves *may* contain the same allegedly unconscionable terms."

Defendants in their demurrer further contended that the measure of damages would be unique to each park. In response to the allegations in the SAC that plaintiffs and the putative class members "paid excess rents for their spaces," defendants noted that because there were 18 parks located in 16 different cities, within seven different counties, in California, and because eight such mobilehome parks were in cities that contained rent control ordinances, the alleged damages suffered by each plaintiff and putative class member would be "unique—based upon the alleged excess rent paid on each space, which requires a factual showing of what the fair market value for rents would be in a particular area at a particular time, and a park-by-park damages appraisal." (Emphasis omitted.)

Defendants in their demurrer also contended that their alleged "unconscionable policies and/or procedures" (see fn. 1, *ante*) that were the primary basis of plaintiffs' first cause of action for unfair business practices "turn[ed] on the personal interactions between each park operator and the individual [p]laintiff, and whether [c]lass members received certain information, asked certain questions leading up to and during the execution of each [l]ease [a]greement, and were actually under duress when they agreed

10

to specific changes to their [l]ease [a]greements," were all "factual issues" that varied from plaintiff to plaintiff. As such, even if the lease agreements turned out to be "functionally identical," defendants contended the " 'tactics' employed by each [d]efendant entity against each [p]laintiff [would] constitute an individualized inquiry."

With respect to the second and third contract-based causes of action for breach of the covenant of quiet enjoyment and breach of duty of good faith and fair dealing, respectively, defendants contended the gist of both causes of action related to what defendants "did" and "not what the [l]ease [a]greements say." (Emphasis omitted.)

Finally, defendants contended the fourth cause of action for fraud was individualized because detrimental reliance was an inherently factual question and because plaintiffs contended in their alleged unlawful business practice allegations that defendants employed various "tactics" to "trap" and "dupe" plaintiffs and the putative class members, thus precluding detrimental reliance from being "inferred from the circumstances surrounding" the lease agreements.

Defendants also contended their demurrer to the class action allegations should be sustained without leave to amend because there was "no single ownership interest in the [d]efendant entities that would grant standing to all putative class members to sue all of the [d]efendants collectively." (Emphasis omitted.) As such, defendants contended the prerequisite that the claims of the representative party be typical of the putative class members could not be met.

Finally, defendants contended a class action lawsuit was unwarranted in this case because many of the putative class members were already involved in nearly identical litigation against some of the same defendants named in the instant case and because

11

plaintiffs' system of 21 subclasses was overly complex and thus negated any benefit to maintaining a single class action. Defendants instead contended a park-by-park approach involving individual plaintiffs, as was the case in various actions that were then pending (as shown in connection with their request for judicial notice), made more sense for a variety of reasons.

In sustaining without leave to amend defendants' demurrer to the class action allegations, the court ruled the SAC failed to "allege facts sufficient to establish a community of interest in the elements of the class claims." Regarding the lack of commonality, the court noted the "problem in this case is that while defendants may have had standard procedures, products or policies in place, the claims of plaintiffs revolve around individual application or use of the policies. In this case, there are 18 different properties and lease agreements. The fact that the lease agreements may contain similar unconscionable terms, while significant for commonality, is not the end of the analysis. The causes of action relate largely to how each individual class member interacted with defendants. The leases were individually negotiated and executed.

"Lack of commonality is inevitable based on the fact that plaintiffs do not reside at the same location, but reside at one of 18 mobile home parks, located in 16 different cities throughout California. Individual issues predominate. Consider damages or restitution based upon the allegation of 'excess rent' (SAC 132). Excess rent calculation necessarily involves an analysis of fair market value in particular areas at particular times, which is unique to location."

After finding a lack of commonality with respect to each of the four causes of action at issue, the court next found "[a]nother significant problem with [the] class

allegations in this case is multiple defendants. Pursuant to the Secretary of State business filings of which the Court has taken judicial notice, the ownership entity for each park is a separately owned, single-purpose limited partnership. (Exhibit 3[.]) This raises the problem of typicality of the representatives."

The court also found the class action was not the superior method of resolving the litigation. In making this finding, the court considered that many class members were then potentially involved in other litigation involving these same parks, thus supporting a finding that a park-by-park approach to such litigation was not only viable but more appropriate in light of the multiple issues created by joining the ligation across multiple parks. In addition, the court found sufficient individual issues made a class approach inefficient.

Because the court already had granted plaintiffs leave to amend to satisfy the commonality and superiority requirements for class action certification or to otherwise change the legal effect of their operative complaint, the court determined no basis existed for granting plaintiffs leave to file a third amended class action complaint.[2]

DISCUSSION

A. *Standard of Review*

" 'On review from an order sustaining a demurrer, "we examine the complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory, such facts being assumed true for this purpose. [Citations.]" [Citation.] We

---

[2]  Plaintiffs' unopposed request for judicial notice of an April 24, 2015 hearing, following the court's order sustaining the demurrer to the class allegations without leave to amend, is granted.

may also consider matters that have been judicially noticed. [Citations.]' [Citation.] ' "[W]hen the allegations of the complaint contradict or are inconsistent with such facts, we accept the latter and reject the former. [Citations.]" [Citation.] We give the same precedence to facts evident from exhibits attached to the pleading. [Citations.]' [Citation.]" (*Tucker v. Pacific Bell Mobile Services* (2012) 208 Cal.App.4th 201, 210 (*Tucker*).)

"If a demurrer is sustained, we exercise our independent judgment on whether a cause of action has been stated as a matter of law, regardless of reasons stated by the trial court. [Citation.] We affirm if the trial court's decision was correct on any theory. [Citation.]" (*Tucker*, *supra*, 208 Cal.App.4th at pp. 210–211.)

It is beyond dispute that trial courts are permitted to decide the issue of class certification on demurrer. (*Tucker*, *supra*, 208 Cal.App.4th at p. 212; see *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 440 [noting the issue is "settled" that courts are authorized to "weed[] out" legally meritless class action suits prior to certification by demurrer or pretrial motion].) A trial court may sustain a demurrer to class action allegations where " 'it concludes as a matter of law that, assuming the truth of the *factual* allegations in the complaint, there is no reasonable possibility that the requirements for class certification will be satisfied. [Citations.]' [Citations.]" (*Tucker*, at p. 211, italics added; see *Canon U.S.A., Inc. v. Superior Court* (1998) 68 Cal.App.4th 1, 5 [noting that when the "invalidity of the class allegations is revealed on the face of the complaint, and/or by matters subject to judicial notice, the class issue may be properly disposed of by demurrer or motion to strike," and noting that "[i]n such circumstances, there is no need to incur the expense of an evidentiary hearing or class-related discovery"].)

14

When a demurrer is sustained without leave to amend, as in the instant case, " 'we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff.' [Citation.] Leave to amend should not be granted where amendment would be futile. [Citation.]" (*Tucker, supra,* 208 Cal.App.4th at p. 211.)

B. *Class Action Requirements and Analysis*

Class actions are permitted "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court . . . ." (Code Civ. Proc., § 382.) "Drawing on the language of Code of Civil Procedure section 382 and federal precedent, we have articulated clear requirements for the certification of a class. The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives. [Citations.]" (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021.) " 'In turn, the "community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." ' " (*Ibid.*) Courts may also consider whether the class action procedure is "superior" to litigating claims individually. (*Sav–On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 332 (*Sav-On Drug Stores*).)

15

Here, the threshold question is whether the SAC adequately presents predominant common questions of law or fact. "Commonality as a general rule depends on whether the defendant's liability can be determined by issues common to all class members: ' "A class may be certified when common questions of law and fact predominate over individualized questions. As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages. . . . [T]o determine whether common questions of fact predominate the trial court must examine the issues framed by the pleadings and the law applicable to the causes of action alleged." ' [Citations.] [¶] 'In examining whether common issues of law or fact predominate, the court must consider the plaintiff's legal theory of liability.' " (*Knapp v. AT&T Wireless Services, Inc.* (2011) 195 Cal.App.4th 932, 941.)

In sustaining defendants' demurrer to the class action allegations without leave to amend, the trial court in the instant case relied on *Newell v. State Farm General Ins. Co.* (2004) 118 Cal.App.4th 1094 (*Newell*). In *Newell*, the plaintiffs were denied benefits by their homeowners insurance carriers after the Northridge earthquake. The complaint alleged the putative class consisted of insureds that had their claims denied because of one or more improper claims practices. The *Newell* court noted that "[e]ven if [the defendant insurers] adopted improper claims practices to adjust Northridge earthquake claims, each putative class member still could recover for breach of contract and bad faith *only* by proving his or her individual claim was wrongfully denied, in whole or in part, and the insurer's action in doing so was unreasonable. [Citation.] Thus, each putative class member's potential recovery would involve an individual assessment of his or her

16

property, the damage sustained and the actual claims practices employed. [Citation.] In such cases, class treatment is unwarranted." (*Id.* at p. 1103.)

The *Newell* court further concluded that the plaintiffs' cause of action for unfair competition "fare[d] no better" (*Newell*, *supra*, 118 Cal.App.4th at p. 1103), inasmuch as that cause of action was "premised on the improper denial of policy benefits; and plaintiffs ultimately seek restitution for the amount of benefits [the defendants] failed to pay. Thus, the individualized assessments necessary for the breach of contract and bad faith causes of action also are necessary to establish liability for unfair competition" (*id.* at pp. 1103-1104).

Turning to the instant case, we independently conclude there is no reasonable possibility plaintiffs can satisfy the community of interest requirement for class certification for each of its four causes of action at issue because common questions of law and fact do *not* predominate.

First, when analyzing the sufficiency of a cause of action for purposes of demurrer, it is axiomatic that we consider the truth of all material facts properly pleaded or all ultimate facts alleged, *but not contentions, deductions, or factual conclusions*. (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966-967 (*Aubry*).) We conclude plaintiffs' allegations in their SAC—which were noticeably absent from their original complaint—that defendants implemented a uniform policy and procedure in *each and every lease transaction* with plaintiffs and the putative class members over a four-year period (i.e., the proposed class period), in each of the 18 mobilehome parks owned and/or operated by Tatum and Kaplan, are not properly admitted for purposes of demurrer because such allegations are not ultimate facts but rather merely contentions and/or

17

improper factual conclusions. (See *ibid.*; see also *Logan v. Southern Cal. Rapid Transit Dist.* (1982) 136 Cal.App.3d 116, 126 [noting the plaintiff bus driver's allegation that he was not afforded due process when he was discharged by the defendant rapid transit district was insufficient to withstand demurrer because the plaintiff failed to present "ultimate facts as to how his due process rights were violated"]; *Lesperance v. North American Aviation, Inc.* (1963) 217 Cal.App.2d 336, 343 [noting to withstand demurrer a pleading " 'must allege facts and not conclusions' "].)

Second, that defendants Tatum and Kaplan, through MCM, *may* have used a lease agreement with similar clauses at each of the 18 different mobilehome parks named in the SAC does not establish that common questions of law or fact predominate over individual issues. (See *Sav–On Drug Stores*, *supra*, 34 Cal.4th at p. 332; *Newell*, *supra*, 118 Cal.App.4th at p. 1103.)

Instead, in light of the unconscionable policies and/or procedures (i.e., (a) through (h), fn. 1, *ante*) defendants allegedly engaged in, we conclude as a matter of law that individual issues predominate, inasmuch as: (i) the alleged unconscionable policies and/or procedures at issue in this case primarily arose out of one-on-one interactions between different defendants (and/or their agents) and each plaintiff and putative class member in each of the 18 mobilehome parks; (ii) these one-on-one interactions allegedly involved improper or unlawful conduct of defendants throughout the negotiation, execution, *and* enforcement of each lease agreement; (iii) the unconscionable policies and procedures alleged in the SAC involved at least *eight* different leasing practices defendants purportedly used to "trap" plaintiffs and the putative class members in connection with the negotiation, execution, and enforcement of each lease agreement;

18

and (iv) several of the *eight* different leasing practices allegedly used by defendants to "trap" plaintiffs and the putative class members involved facts particular to the individual negotiation of the lease agreement, including, by way of example only, (a) whether plaintiffs and the putative class members were presented with the lease agreement on a "take it or leave it basis," (b) whether plaintiffs and the putative class members were provided all documents related to the lease at the time of its execution, and (c) whether plaintiffs and the putative class members signed the lease under duress. (Compare with *Prince v. CLS Transportation, Inc.* (2004) 118 Cal.App.4th 1320, 1323, 1329 [noting in dictum that the plaintiffs' wage and hour class action should not have been decided at the pleading stage because plaintiffs alleged "institutional practices by [the defendant] that affected all of the members of the potential class in the *same manner*," namely that defendant " 'paid its drivers only for the time they were on driving assignments rather than for the full duration of their shifts' " (italics added)].)

Turning to the first cause of action for unfair business practices, plaintiffs in their SAC alleged defendants "engaged in unlawful and unfair business practices by utilizing the deceptive, oppressive and misleading tactics to trap [c]lass members into unconscionable leases without the ability to protect themselves, including but not limited to, conduct alleged in ¶¶ 49-50 [i.e., defendants' unconscionable policies and/or procedures as set forth in (a) through (h)]" in the SAC. In light of our conclusion *ante* that individual issues predominate with respect to the unconscionable policies and/or procedures alleged by plaintiffs, we independently find class treatment unwarranted in connection with plaintiffs' unfair business practices cause of action. (See *Newell*, *supra*, 118 Cal.App.4th at pp. 1103-1104.)

19

What's more, we further independently conclude that class treatment is inappropriate with respect to plaintiffs' unfair business practices cause of action because there are substantial and numerous factually unique questions to be resolved in determining plaintiffs' and the putative class members' right to recovery, if any. (See *Acree v. General Motors Acceptance Corp.* (2001) 92 Cal.App.4th 385, 397 (*Acree*) [stating the general rule that a "class action can be maintained even if each class member must at some point individually show his or her eligibility for recovery or the amount of his or her damages, so long as each class member would not be required to litigate substantial and numerous factually unique questions to determine his or her individual right to recover" (fn. omitted)]; see also *Hicks v. Kaufman & Broad Home Corp.* (2001) 89 Cal.App.4th 908, 924 [denying motion for class certification for lack of commonality based on need for "individualized proof" of each putative class member to "come forward and prove specific damage to [his or] her home (e.g., uneven floors, insect infestation, misaligned doors and windows)"]; *Silva v. Block* (1996) 49 Cal.App.4th 345, 352 [denying certification on demurrer because, even if plaintiffs could prove allegation of common improper policy, recovery of each putative class member is dependent on individualized proof of constitutional injury].)

Indeed, plaintiffs in their SAC alleged that, as a result of defendants' unfair business practices and implementation of standardized unconscionable lease clauses, plaintiffs and the putative class members "suffered monetary losses and paid excess rent for their spaces." Plaintiffs thus sought restitution, repayment of the excess rental payments, and disgorgement of defendants' alleged improper profits.

20

However, because there are 18 mobilehome parks at issue in this case, 16 of which are located in different cities in California, and because eight of these parks are located in cities that contain rent control ordinances, we independently conclude recovery of any alleged excess rents paid by plaintiffs—and/or any disgorgement of ill-gotten profits obtained by defendants—would not only be unique as to each plaintiff and putative class member, but also as to each park. That is, determining excess rents and improper profits, if any, would depend in our view on a factual showing of what the fair market value for rents would have been in *each* park (and perhaps particular spaces within a given park), at *any* given time within the four-year class period. As such, for this separate and independent reason we independently conclude plaintiffs' first cause of action for unlawful business practices does not warrant class treatment.

We reach the same conclusion with respect to plaintiffs' second and third causes of action. In their second cause of action for breach of the covenant of quiet enjoyment, plaintiffs alleged in their SAC that defendants breached this covenant by "raising rents to unreasonable and unconscionable levels," "charging unlawful fees," and by subjecting plaintiffs and the putative class members to "illegal transfer" charges and/or fees that allegedly interfered with their ability to sell their mobilehomes.

As already noted, the issue of whether defendants Tatum and Kaplan, through MCM, charged unreasonable rents involves in our view substantial and numerous unique factual questions that make class treatment unwarranted. (See *Acree*, *supra*, 92 Cal.App.4th at p. 397.)

21

Regarding "unlawful fees," we note that term is not defined in the SAC[3] and, thus, is merely a contention, deduction, or factual conclusion that is not properly admitted for purposes of demurrer. (See *Aubry*, *supra*, 2 Cal.4th 962 at pp. 966-967.) However even if considered on demurrer, we conclude individual issues predominate regarding what constitutes "unlawful fees" and the amount of refunds, if any, of such fees at each of the 18 mobilehome parks located throughout California.

Finally, we note the SAC dedicated a specific subclass to the illegal transfer fees allegedly imposed by defendants during the class period. Although defined (unlike the term "unlawful fees"), we nonetheless conclude individual issues predominate over common ones regarding the amount or amounts of such transfer fees, if any, paid by plaintiffs and the putative class members, and the amount of refunds, if any, of such transfer fees, at each of the 18 mobilehome parks named in the SAC. Our conclusion on this issue is buttressed by the fact that such transfer fees would not be paid by all plaintiffs or putative class members, but instead only by those class members who actually "transferred their interest in their mobilehome . . . to another individual or entity" at each of the 18 parks.

In their third cause of action, plaintiffs alleged that they and the putative class members were in "an inherently unequal bargaining position" with defendants, thus making them "economic hostages," and that defendants breached the covenant of good

_____

3      As noted, plaintiffs *separately* alleged defendants breached the covenant of quiet enjoyment by charging plaintiffs and the putative class members a transfer or selling "fee"/"charge[]" during the class period. As such, and to avoid rendering the "transfer" fee allegation superfluous, it appears "unlawful fees" would *not* include a "transfer" fee. (See, e.g., *Carmel Development Co. v. RLI Ins. Co.* (2005) 126 Cal.App.4th 502, 511.)

faith and fair dealing "by engaging in the conduct alleged above, by charging unlawful fees and by raising rents to unreasonable and unconscionable levels."  As before, we conclude such allegations necessarily involve individualized inquiries inasmuch as not all mobilehome owners are in the same economic position at even *one* of the 18 mobilehome parks, much less at all such parks located throughout California.

Moreover, in light of our conclusions *ante* that individual issues predominate over common ones with respect to the *conduct* at issue in the SAC, including the unconscionable policies and/or procedures defendants allegedly engaged in, and with respect to the alleged charging of unreasonable rents and "unlawful fees" by defendants across each of their 18 mobilehome parks, we further independently conclude plaintiffs' third cause of action for breach of covenant of good faith and fair dealing does not warrant class treatment.

Turning to the fourth cause of action for fraud and deceit, plaintiffs alleged that defendants "knowingly concealed, failed to disclose, and/or made false misrepresentations regarding material terms of the lease agreements."  Plaintiffs further alleged in connection with this cause of action that defendants did so "with the intention of defrauding or inducing [p]laintiffs' and [c]lass members' reliance thereon"; and that plaintiffs and the putative class members "justifiably relied on [d]efendants' concealment, nondisclosure, and false misrepresentations, and as a proximate result were damaged."

We also independently conclude that class treatment is unwarranted for plaintiffs' fraud and deceit cause of action because plaintiffs must plead and prove actual reliance. (See *Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1092 (*Mirkin*).)  Under the facts of this case, where different defendants (and/or their agents) individually negotiated the lease

23

agreements in 18 separate mobilehome parks, the inquiry into the purported misrepresentations is inherently individualized. (See *Tucker*, *supra*, 208 Cal.App.4th at pp. 222, 224 [noting if the issue of reliance "would vary from consumer to consumer, the issue is not subject to common proof, and the action is properly not certified as a class action," and noting reliance was not established on a class-wide basis because the "purported misrepresentations were communicated to class members through a variety of written materials, through the mail, via the Internet, by telephone and in retail stores"]; compare, *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 811-812 (*Vasquez*) [noting in a consumer class action it was proper to infer that each member of a class had actually relied on the defendant's misrepresentations because there plaintiffs asserted that "they [could] demonstrate [that the] misrepresentations were in fact made to each class member without individual testimony because the salesmen employed by [the defendant seller] memorized a standard statement containing the representations (which in turn were based on a printed narrative and sales manual) and that this statement was recited by rote to every member of the class"], as cited and quoted in *Mirkin*, *supra*, 5 Cal.4th at p. 1094 [noting the reliance inferred in *Vasquez* was, "under the peculiar facts of the case, . . . truly a common issue"].)

Apart from reliance, plaintiffs' allegations that defendants "knowingly concealed, failed to disclose, and/or made false misrepresentations regarding material terms of the lease agreements" in our view would also require individual factual determinations regarding what each plaintiff and/or putative class member was told, or not told, as the case may be, by different defendants (and/or their agents) during the negotiation of each lease agreement at each of the 18 mobilehome parks during the proposed class period.

As such, for this separate reason we independently conclude class treatment is unwarranted in connection with plaintiffs' fraud and deceit cause of action.

C. *Leave to Amend*

As noted *ante*, when, as here, a trial court sustains a demurrer without leave to amend, we review the decision not to allow further amendment under the abuse of discretion standard. (*Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 889–890 (*Cantu*).) We decide whether there is a reasonable possibility that the defect or defects in the complaint can be cured by an amendment; if so, the court has abused its discretion and we reverse. (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865.)

"The burden of proving [a] reasonable possibility [of a curative amendment] is squarely on the plaintiff." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) "To meet this burden, a plaintiff must submit a proposed amended complaint or, on appeal, enumerate the facts and demonstrate how those facts establish a cause of action. [Citations.] Absent such a showing, the appellate court cannot assess whether or not the trial court abused its discretion by denying leave to amend." (*Cantu*, *supra*, 4 Cal.App.4th at p. 890.)

Here, plaintiffs contend the trial court erred when it denied them leave to file a third amended class action complaint. They contend they could amend their complaint to clarify that their causes of action "are based only on the common terms and common leasing practices—not on terms and practices that varied from person to person." We disagree.

In light of the fact the proposed class included 18 mobilehome parks located throughout California and involved the negotiation of individual lease agreements by

25

different defendants (and/or their agents) in each park, and in light of the fact the causes of action at issue involved the *conduct* of defendants with respect to the negotiation, execution, and/or enforcement of each such lease, we conclude there is no reasonable possibility that plaintiffs could amend their class action complaint yet again to assert causes of action that allegedly are based only on "common leasing practices" of defendants throughout all 18 parks.

In addition, we separately conclude there is no reasonable possibility plaintiffs, by further amendment, could cure their class action allegations with respect to the four causes of action at issue because, in our view, their attempts to recover excess rent, disgorgement of profits, and other damages and/or fees from defendants involves substantial and numerous factually unique assessments. Indeed, as already noted, to recover excess rents would require among others an analysis of fair market values in various locations throughout California during the proposed (four-year) class period. Because recovery turns on individualized proof, for this separate and independent reason we conclude the court did not err when it denied plaintiffs leave to file a third amended class action complaint.[4]

---

[4]    In light of our conclusion, we deem it unnecessary to reach defendants' alternate contentions including that the claims of the putative class members are not typical of the class and that a class action is not the superior method of litigating this case.

26

DISPOSITION

The order granting defendants' demurrer to the class action allegations in the four causes of action at issue is affirmed. Defendants to recover their costs of appeal.


BENKE, Acting P. J.

WE CONCUR:


HUFFMAN, J.


HALLER, J.

27